1   BARRY J. PORTMAN
    Federal Public Defender
2   JEROME E. MATTHEWS
    Assistant Federal Public Defender
3   555 - 12th Street
    Suite 650
4   Oakland, CA 94607-3627
    Telephone:  (510) 637-3500
5
    Counsel for Defendant DESEAN GARDNER
6

7

8                    IN THE UNITED STATES DISTRICT COURT

9               FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,              )   No. CR-09 00203 CW
                                           )
12                  Plaintiff,             )   **DESEAN GARDNER'S SENTENCING**
                                           )   **MEMORANDUM**
13  vs.                                    )
                                           )   **Date:  September 14, 2011**
14  DESEAN GARDNER,                        )   **Time:  2:00 pm.**
                                           )
15                  Defendant.             )
    _____)
16

17

18

19

20

21

22

23

24

25

26

1

2                              **TABLE OF CONTENTS**

3
1.    Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

3.    Comments on the Pre-Sentence Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

4.    Sentencing Recommendation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

       A.    A Sentence of No More Than Thirteen Years is Just Punishment . . . . . . . . . . . . 9

             (1)    A compelling approach to sentencing in drug cases . . . . . . . . . . . . . . . . 9

             (2)    The sentence this Court imposes should be proportional to those imposed
                    on the co-defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

             (3)    The crack/powder disparity justifies a below-guidelines sentence . . . . . 13

             (4)    The career offender provision is inconsistent with § 3553(a) . . . . . . . . 15

             (5)    The career offender predicates in this case are relatively minor . . . . . . . 17

             (6)    Assuming the Court applies a 1:1 ratio in determining the base offense
                    level, the 4-level organizer-leader enhancement unduly skews the
                    sentencing range . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       B.    A Sentence of No More than Thirteen Years Will Create Adequate
             Deterrence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

       C.    Desean Has Demonstrable Capability to Rehabilitate Himself . . . . . . . . . . . . . 18

       D.    Protection of the Public . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

       E.    A Sentence of No More Than Thirteen Years Will Permit Necessary Treatment
             and Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

5.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

1

2 **TABLE OF AUTHORITIES**

3

4 *Kimbrough v. United States,*
   128 S. Ct. 558 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

5 *Rita v. United States*
   127 S. Ct. at 2456 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

6

7 *Santosky v. Kramer,*
   455 U.S. 745 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

8 *Tapia v. United States,*
   131 S. Ct. 2382 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

9

10 *United States v. Bannister,*
   2011 WL 1361539 (E.D.N.Y, April 8, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

11 *United States v. Barsumyan,*
   517 F.3d 1154 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16, 18

12

13 *United States v. Martin,*
   520 F.3d 87 (1st Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

14 *United States v. Medina Casteneda,*
   511 F.3d 1246 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

15

16 **FEDERAL STATUTES**

17

18 18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 9

19 18 U.S.C. § 924(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

20 18 U.S.C. § 994(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

21

22

23

24

25

26

BARRY J. PORTMAN
Federal Public Defender
JEROME E. MATTHEWS
Assistant Federal Public Defender
555 - 12th Street
Suite 650
Oakland, CA 94607-3627
Telephone: (510) 637-3500

Counsel for Defendant DESEAN GARDNER

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR-09 00203 CW |
| | ) | |
| Plaintiff, | ) | **DESEAN GARDNER'S SENTENCING** |
| | ) | **MEMORANDUM** |
| vs. | ) | |
| | ) | **Date: September 14, 2011** |
| DESEAN GARDNER, | ) | **Time: 2:00 pm.** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**1. Preliminary Statement**

This is the type of unfortunate case where events have conspired to determine the
trajectory of a young man's life and the outcome seems foreordained. Simply stated, it is no
surprise that Desean Gardner will stand before the Court for sentencing after pleading guilty to
conspiracy to distribute crack cocaine. The Court need only peer just beneath the surface of
Desean's life to see why this is so – he was born to a crack-addicted mother whose husband was
also her pimp, and little transpired since that time to change his lot. Just a few of the highlights:
at the age of four, he witnessed a man beat his mother so badly she went to the hospital with
fractured ribs; his mother abandoned Desean and his brother shortly thereafter, and the two lived

1   in his grandmother's residence, a small three-bedroom home, overrun with more than twenty

2   children and their crack-addicted parents; those crack-addicted parents spent their welfare checks

3   and food stamps on drugs, and consequently drained the household's monthly food supply in a

4   mere two weeks; at the age of six, lacking a responsible parent, Desean began to cook for himself

5   and other children in the home; a drug-dealing cousin once mistakenly thought that the baby

6   powder between Desean's toes was the cousin's powder cocaine, put a gun to Desean's head, and

7   threatened to kill him; not to be outdone on the scale of violence, Desean's father, following a

8   heated argument, knocked Desean unconscious.

9       A sentencing judge often must undertake a searching inquiry to grasp what underlies the

10   conduct leading to the count of conviction.  Not so here.  Everything about Desean's upbringing

11   ineluctably points to it.  He was so inculcated by his parents and the drug culture surrounding

12   them that at the age of seven, while he was in second grade, Desean exclaimed during a career

13   day gathering that he wanted to be a pimp and hustler like his father.

14       Against this backdrop of neglect, abuse and inappropriate childhood influences, this

15   Court must now determine an appropriate sentence.  The starting point is the intersection of two

16   provisions of the Sentencing Guidelines, each of which has drawn especially sharp criticism from

17   the federal bench, and one of which has long been lamented by the Sentencing Commission

18   itself: the crack guidelines and the career offender scheme.  Collectively, these Guidelines

19   provisions have generated a wealth of legal challenges, statistical research, legislative hearings,

20   Sentencing Commission revisions and scholarly debate.  Neither of these provisions can honestly

21   be reconciled with 18 U.S.C. §3553(a), and neither should dictate the sentence in Desean's case.

22       The government doubtlessly will point out that this case involves a large amount of crack

23   cocaine.  True enough.  But drug quantity is a poor proxy for harm, and, given the irrational

24   severity of the applicable guidelines here, is an equally irrational sentencing predicate.

25       More important, Desean has shown himself to be capable of rehabilitation, given

26   appropriate guidance, assistance and support.  The Supreme Court recently made clear, *see Tapia*

*v. United States*, 131 S.Ct. 2382 (2011), that a district court may not impose a lengthier prison sentence in order to promote rehabilitation. This Court accordingly should consider alternatives other than imprisonment to help Desean along this path.

For these reasons and those that follow, Desean Gardner respectfully requests that the Court sentence him to no more than thirteen years (156 months).

**2. Background**

One would not be surprised to learn that a child growing up in a crime-infested neighborhood overrun with crack houses might turn out to be a drug dealer himself. This is especially likely when that child's mother abandons him at five years of age, and his father provides him with personal training and assistance in the art of narcotics trafficking. Desean's life started just this way.

\* \* \*

The story begins with Nathaniel Gardner "Gardner," Desean's father. Gardner grew up in a family of pimps, became a pimp himself, and pimped Paulette Wigfall, Desean's biological mother, from the time she was seventeen years old. Declaration of Frank Tamburello "Tamburello Decl.," ¶¶ 4, 15; PSR ¶ 71.[1] He also introduced Ms Wigfall to freebasing cocaine. Tamburello Decl., ¶ 5. True to his self-indulgent lifestyle, Gardner was at the hospital – albeit stoned on heroin – at the time of Desean's birth, while ironically lamenting Desean's lack of prenatal care due to Ms Wigfall's use of marijuana and cocaine throughout her pregnancy. *Id.*, ¶ 6.

In addition to using heroin, Gardner sold heroin, and made a handsome living doing so. With Gardner's success came fancy cars, expensive clothing, fine dining, lots of cash and frequent vacations. In fact, Gardner had held only one legitimate job in his life, and that lasted for only one year. *Id.*, ¶ 26. This lifestyle, not unexpectedly, made an indelible impression on

---

[1]     All further factual source references will be to the Tamburello Decl., the PSR, or both.

1   Desean – while in second grade, during career day at school, Desean reported that he wanted to

2   be a pimp and hustler like his father. Gardner was highly embarrassed to learn what his son had

3   said at school, and he was upset knowing that his lifestyle had been exposed. Despite his

4   professed embarrassment, Gardner, unrepentant, continued with his lifestyle. For example, after

5   learning that Desean's $250 jacket had been stolen by another student, Gardner armed himself

6   with a pistol in Desean's presence and took Desean to the student's home to retrieve the jacket.

7   *Id.*, ¶¶ 11-12. Fortunately, the jacket was retrieved without incident; the method Gardner

8   employed, however, further shaped the course of his son's life.

9          In late 1983, with Gardner in prison, Ms Wigfall abandoned Desean and his siblings,

10   before heading to Las Vegas with another man. One of Gardner's sisters picked up both boys

11   from the location where they had been abandoned, and took them to the home of Nathaniel

12   Gardner's mother, Ruby Gardner. The boys stayed there until Nathaniel Gardner's release from

13   prison in August 1984. *Id.*, ¶ 8.

14          Upon his release, Gardner helped Ms Wigfall get an apartment and he began sharing

15   custody of Dontae and Desean with her. Ms Wigfall continued to use drugs, as did Gardner.

16   Desean, who became upset and complained each time he learned that his mother was purchasing

17   drugs from drug dealers in East Palo Alto, often asked his father to help him extract Ms Wigfall

18   from a local crack house; Gardner just as often refused, stating that Ms Wigfall was an adult and

19   could do as she pleased. *Id.*, ¶ 9.

20          In 1990, Gardner returned to prison for robbery and served a three and one-half year term.

21   When Gardner was released from prison, Desean came to live with him on Camilia Street in East

22   Palo Alto, in an area known as The Gardens. While living in The Gardens, Desean witnessed

23   shootings, stabbings, robberies, car jackings and intravenous drug use on a regular basis. *Id.*, ¶

24   13.

25          At age seventeen, Desean moved out of Gardner's home and has been on his own since

26   that time. *Id.*, ¶ 14.

SENTENCING MEMORANDUM          -4-

* * *

Paulette Wigfall, Desean's biological mother, had a dismal life as well, and her experiences made a deep impression on Desean.  Ms  Wigfall and Gardner lived together until 1978, after which she returned to her parent's residence at 1338 Savier Avenue, East Menlo Park.  By then, Ms  Wigfall's father had died and her mother, Emma, was sharing the house with Ms  Wigfall's five siblings and their eight young children.  *Id.*, ¶ 16.

When Desean was born in 1979, Ms  Wigfall and all of her siblings in the house were heavily addicted to freebasing cocaine.  No one was employed, and everyone spent their welfare checks and food stamps immediately on drugs.  The only money available to buy food came from the WIC program for children with iron deficiencies.  Ms  Wigfall would hide the food she bought in a closet, and after two weeks, all of the food would be eaten and the kids went hungry until the next check became available.  *Id.*, ¶ 17.

Uneducated and addicted to drugs, Ms  Wigfall did whatever it took to make money, including prostitution, drug dealing, and boosting clothes that she sold on the street.  While she was out of the house most of the night, her mother took care of both Dontae and Desean.  *Id.*, ¶ 18.

In 1982, Ms  Wigfall met a man named Clint Windam and bore him a daughter.  Clint Windam used to beat Ms Wigfall in front of Desean, who was just four years old at the time.  One of these beatings was so severe that Ms  Wigfall was hospitalized with broken ribs.  At that point, Ms  Wigfall's drug use accelerated, she lost her job, and was unable to care for Desean or Dontae. She abandoned Desean and Dontae on the street without clothing or food.  She went to prison in 1984, and upon her release from custody in 1987, returned home to find all of her siblings tweaking from drug abuse.  *Id.*, ¶ 19-20.

With Ms  Wigfall consumed by drugs, Desean was left to feed, clothe and prepare his little sister for school, as well as keep the house in order.  During this time, Ms  Wigfall recalled getting a call from school administrators who said Desean had claimed that both of his parents

1    were dead. *Id.*, ¶ 21. In 1988, she again was arrested, and was sent back to prison for two years.

2    In 1991, Ms Wigfall went to prison for the third time. *Id.*, ¶ 22.

3        Following her release from prison, Ms Wigfall relapsed. Badly. In fact, she was so drug-

4    addicted that she had Desean, at age 15, drop her off at a crack house in Menlo Park where she

5    remained for three days. In the interim, Desean, driving her car, made numerous drug runs on his

6    mother's behalf, while she cycled in and out of jail, crack houses, and shelters. Desean did not

7    want his mother to visit any of the crack houses in The Gardens because the area was too

8    dangerous. *Id.*, ¶ 23. Indeed, after learning that his mother had sold all of her best jewelry to buy

9    drugs, Desean and his older brother began supplying her with drugs themselves because they

10   were upset that neighborhood drug dealers were taking advantage of her. *Id.*, ¶ 38.

11       Eventually, at age 16, Desean was placed in EE's group home in San Jose. This was one

12   bright spot in an otherwise dismal life. Freed from the destructive lifestyle that enveloped his

13   family and surrounded by positive influences, Desean attended school regularly, improved his

14   grades dramatically, and became gainfully employed. After two years, however, Desean was

15   legally an adult and EE's could no longer house him. Motivated by a desire to continue the

16   success he was enjoying, Desean successfully petitioned EE's to stay beyond his eighteenth

17   birthday. After an additional six months at the home, he was forced to return to his family.

18                                           * * *

19       One of Desean's few positive influences was Vicki Smothers. She also prostituted

20   herself for Desean's father, and in 1976, left Hawaii because she was tired of Gardner beating

21   her, lying to her and cheating her. Ms Smothers got back together with Nathaniel Gardner in

22   California and began selling heroin for him. At that time, Gardner, Ms Smothers and Paulette

23   Wigfall all were using both heroin and cocaine. *Id.*, ¶¶ 27-28.

24       Ms Smothers was well aware of the conditions in which Desean was "raised." She

25   understands that Desean descends from a long line of players, pimps and dope dealers on

26   Gardner's side of the family. More important, she notes that Gardner approved of and counseled

1   Desean in the art of drug dealing.  Predictably, all three of Gardner's sons have been to prison for

2   drug related offenses.  *Id.*, ¶ 39.

3          Shortly after Gardner first went to prison, Desean moved in with his maternal

4   grandmother, Ms Emma Beckum, his mother's ten siblings, and all of her siblings' children.  To

5   make matters worse, Ms Beckum apparently had undiagnosed mental health issues and almost all

6   of Desean's mother's sibling were addicted to drugs.  Indeed, Ms Beckum kept cash in her

7   brassiere to avoid having her own children steal money from her.  *Id.*, ¶ 29.

8          Ms Beckum's house had only three bedrooms stacked with double rows of bunk beds

9   where Dontae and Desean shared a single bunk.  In addition to the cramped and emotionally

10  challenging living conditions, Desean was cooking for himself at six years of age.  *Id.*, ¶ 30.

11         Throughout 1987, Desean spent weekends, holidays and time off from school at Ms

12  Smothers' home.  Ms Smothers provided Desean with new clothing to wear, but he was not

13  allowed to take the clothing back to Mrs. Beckum's house because it would be stolen

14  immediately by his mother's relatives.  *Id.*, ¶ 31.

15         In late 1987, Dontae and Desean moved in with Ms Smothers and stayed with her at two

16  locations until December, 1988, when Ms Smothers and Nathaniel Gardner ended their

17  relationship.  At that point, both boys went to live at Gardner's home on Camellia Drive in East

18  Palo Alto.  *Id.*, ¶ 32.  Unfortunately, Gardner continued both selling and using drugs, and running

19  around with several different women.l *Id.*, ¶ 36.  Equally unfortunate was Gardner's

20  demonstrably short temper: he often physically confronted Desean, and after one particular

21  heated dispute, knocked Desean unconscious.  *Id.*, ¶ 37.

22         In March 1989, Ms Smothers quit using drugs for good, having made the decision shortly

23  after she began selling drugs with her children, and realized that what she had been doing was

24  wrong.  *Id.*, ¶ 33.

25         Ms Smothers noted that during 1992 and 1993, East Palo Alto was the murder capital of

26  the United States and as a consequence, Desean, without any supervision, saw it all, including

SENTENCING MEMORANDUM                    -7-

robberies, shootings and rampant drug abuse.  *Id.*, ¶ 35.

**3. Comments on the Pre-Sentence Report**

The probation officer has authored a thoughtful and comprehensive report, to which there are no factual objections.  The sole legal objection goes to the criminal history score calculation.  Defense counsel believes that the false personation conviction listed in ¶ 42 should not be scored because the sentence is not considered a "separate" sentence under the guidelines.  USSG §4A1.2(a)(2)(B) provides that sentences imposed for different offenses are counted as a single sentence when there is no intervening arrest and the sentences for both offenses are imposed on the same day.  That is the case here.  According to documents made available to defense counsel by the probation officer, police arrested Desean on 16 March 2001 for both the drug offense described in ¶ 41 and the false personation offense described in ¶ 42.  Judge Emerson of the Santa Clara County Superior Court imposed judgment on both offenses on 14 December 2001.  Accordingly, the 2-point criminal history assessment should not apply, and Desean's total criminal history should be 12 rather than 14.

The probation officer recommends a sentence of 220 months, or 18 years, 4 months.  While Desean respects the probation officer's section 3553(a) analysis, he believes that a sentence of no more than 13 years is, in light of the record and recent Supreme Court precedent, more consistent with the statute's directive to impose a sentence no longer than that necessary to accomplish its stated goals.

**4. Sentencing Recommendation**

The Supreme Court recently altered the now familiar post-*Booker* landscape by reminding the district courts that prison sentences may not be increased to serve the purposes of rehabilitation, for the simple – and statutorily expressed – reason that imprisonment is not designed to rehabilitate criminal defendants.  In *Tapia v. United States*, 131 S.Ct. 2382 (2011), the Court considered the relationship between 18 U.S.C. §§ 3553(a) and 3582(a), and held that it was error for a district court to increase a term of imprisonment in order to promote a defendant's

1  rehabilitation.[2]  *Tapia*, 131 S.Ct. At 2389-90.  When, as here, a defendant's background begs the

2  need for rehabilitation, the Court should tailor its sentence to maximize that salutary objective by

3  imposing a lesser amount of prison time.[3]

4      A sentence of no more than thirteen years is sufficient but not greater than that necessary

5  to meet the directives of 18 U.S.C. §3553(a), as clarified by *Tapia*.

6      **A.      A Sentence of No More Than Thirteen Years is Just Punishment**

7              (1)      A compelling approach to sentencing in drug cases.

8      Before delving into the myriad reasons why a sentence of no more than thirteen years is

9  appropriate, defense counsel wishes to bring to the Court's attention a recent decision that

10  addresses many of the issues extant here.  In *United States v. Bannister*, 2011 WL 1361539

11  (E.D.N.Y, April 8, 2011), a meticulously researched 66-page opinion comprising a wealth of

12  historical data and scholarly analysis, District Judge Jack B. Weinstein took the sentencing bull

13  by the horns and determined that incarceration, even in multi-defendant conspiracy cases

14  involving large amounts of drugs, was only part of the answer – and a relatively small one at that.

15  The *Bannister* case is remarkably similar to this one, and its facts therefore merit discussion.[4]

16      *Bannister* involved a crack cocaine and heroin distribution conspiracy, the object of

17  which was drug trafficking in a public housing project in Brooklyn, New York.  Eleven

18  defendants were named in a 23-count indictment.  The conspiracy was a well-organized drug

19  distribution organization,[5] with each member carrying out a specified and integral part of the

20

21      [2]      Section 3582(a) instructs that "imprisonment is not an appropriate mans of

22  promoting correction and rehabilitation."

23      [3]      This indeed is the government position on what the district court may do to foster

24  rehabilitation, although the Supreme Court expressed no views on it.  *Tapia*, 131 S.Ct. at 2390

    n.5. (noting government's argument that "Congress did not intend to prohibit courts from

    imposing *less* imprisonment in order to promote a defendant's rehabilitation).

25      [4]      A copy of the decision is attached to this memorandum as Exhibit A.

26      [5]      The organization was named "The Clifton Palace Crew."

SENTENCING MEMORANDUM                         -9-

1    operational whole.  More than 4.5 kilograms of crack and 3 kilograms of heroin was estimated to

2    have been distributed during the conspiracy's two and one-half year duration.

3            Judge Weinstein struggled to determine appropriate sentences given the following

4    concerns: the ethnicity of the defendants (ten African-Americans, one Hispanic); the defendants'

5    uniformly dysfunctional families; the long-term effects of historical segregation; the

6    disintegration of family structure in inner-city neighborhoods in general, and the economic

7    deprivation, limited educational and employment opportunities, and criminal activity endemic to

8    the defendants' neighborhoods in particular; and, not least, the disparate impact upon African-

9    Americans of the federal drug laws.  The results painted a bleak picture.[6]

10           The conclusion Judge Weinstein drew from his analysis was entirely consistent with, if

11   not a blueprint for, the Supreme Court's decision in *Tapia* – he noted that high rates of

12   recidivism undermined the notion that prison promoted rehabilitation.

13           The court discussed at length each defendant's family life, education, employment history

14   and role in the conspiracy, then weighed these factors to formulate appropriate sentences.  Two

15   *Bannister* co-defendants in particular are worthy of mention.  The first, Cyril McCray,

16   participated in the duration of the conspiracy, had "an extensive history of serious, violent

17   criminal offenses," and, at offense level 35 and Criminal History Category VI, was subject to a

18   guidelines range of 292 to 365 months.  The court imposed a sentence at the mandatory

19   minimum of ten years.  The second, Derrick Tatum, initiated the conspiracy, led and supervised

20

21

22

---

23           [6]     Similar data was obtained for the City of East Palo Alto for the seven-year period
      beginning in 1990 and ending in 1996; not surprisingly, it is similarly abysmal.  A compilation,
24   including source identification, is attached to the Tamburello Decl. as Exhibit 1.  Across indices
      including unemployment, per capita income, families living below the poverty level, and high
25   school graduation rates, East Palo Alto lags far behind the rest of San Mateo County.  As to
      crimes per 10,000 residents, East Palo Alto exceeded the statewide average for five of the seven
26   years included in the compilation.

SENTENCING MEMORANDUM            -10-

the "crew,"[7] and was responsible for the distribution of more than 4.5 kilograms of crack cocaine and 3 kilograms of heroin.  At offense level 39 and Criminal History Category IV, he faced 360 months to life in prison.  The court sentenced him to fifteen years.

Similar environmental conditions present themselves here.  During Desean's formative years, East Palo Alto was a dismal place.  For example, when Desean was 12 years old, East Palo Alto's unemployment rate was more than twice that of San Mateo County, and remained so when he turned 18; at $9,968, its per capita annual income was less than half that of San Mateo County; more than 14% of its families lived below poverty level; and, only 60.6% of the population had graduated high school.  Tamburello Decl., Exh. 1.

While *Bannister* is instructive because of its similarities to the present case, there are some notable differences.  First, unlike the well-organized network constituting "The Clifton Palace Crew," the conspiracy in this case barely deserves the appellation.  Desean was a distributor who supplied crack cocaine to his co-defendants, not the chief of a unitary entity that trafficked crack cocaine within a given locale.  Although there are instances in which Desean directed a co-defendant to make a pick-up or delivery, or, in a few instances, instructed co-defendants where to sell crack cocaine, there was no true operational structure connecting the co-defendants in this case; rather, the common connection is that a number of disparate drug dealers were able to buy crack cocaine from Desean Gardner.

Second, the two *Bannister* co-defendants described *ante* also received guidelines increases for possessing firearms in connection with the conspiracy to distribute offense.  In fact, the court noted that most members of "the crew" carried guns, and that police seized fourteen guns, ammunition and a machete from residences associated with the organization.  To defense counsel's knowledge, only one weapon was seized in the present case, and that was from a

---

[7]    His leadership role included recruiting members, determining how much each should be paid, negotiating major transactions, and taking a portion of all sales proceeds.

1    defendant not alleged to have conspired with Desean.[8]

2          More important, it does not appear that any of the *Bannister* defendants were counseled in

3    the fine art of drug dealing by their own parents.  The enormity of this fact cannot be overstated.

4    While it is reasonable for society to expect one to conform his behavior in spite of external

5    influences, it is another thing entirely when the behavior itself is born of instruction by members

6    of one's own family.  This is especially true when the instruction emanates from a parent – in this

7    case from father to son – whom a child naturally reveres and wishes to emulate.

8          While the physical abuse Desean suffered at his father's hand was terrible, receiving

9    parental instruction in criminal behavior runs a close second.  Not all abuse leaves physical scars;

10   tutoring your child on how to commit a crime is as morally arrestive as striking him.  In some

11   respects it is even more so because learning to defend oneself from physical attack is a natural

12   mechanism, quickly learned; developing proper behavior, however, is more nuanced and

13   becomes difficult if not impossible when criminality becomes an accepted part of everyday life.

14   As the late then Justice Rehnquist once noted, "It requires no citation of authority to assert that

15   children who are abused in their youth generally face extraordinary problems developing into

16   responsible, productive citizens."  *Santosky v. Kramer*, 455 U.S. 745, 789 (1982) (Rehnquist, J.,

17   with Burger, C.J., and White and O'Connor, JJ., dissenting).

18         Desean believes that Judge Weinstein's opinion in *Bannister* provides a useful and

19   rational approach to sentencing in this case: there are notable parallels, both in terms of the

20   offense conduct and the social environment in which the conduct took place; the applicable

21   guidelines in both cases are inordinately high; and, the mitigating factors in each case are

22   compelling.  A sentence of no more than thirteen years is a rational and just result.

23

24   ───────────────────

25         [8]    Co-defendant Alfred Washington pleaded guilty to possessing a firearm in
     furtherance of drug trafficking under 18 U.S.C. § 924(c).  The factual basis included the
26   admission that he possessed with intent to distribute 1.116 kilos of crack cocaine.  Mr
     Washington was alleged to have conspired with co-defendant Andre Anderson, not Desean.

(2)     The sentence this Court imposes should be proportional to those imposed on the co-defendants.

A sentence of no more than thirteen years also will ensure that Desean's sentence bears a proportional relationship to those sentences imposed upon the co-defendants.

This case involved thirty-nine co-defendants, all of whom engaged in substantially the same conduct, i.e. the purchase and sale of drugs.  At least four were career offenders;[9] many pleaded guilty to "phone counts," and were sentenced to four years or less; the highest sentence imposed on any co-defendant is ten years.

Desean does not suggest that drug quantity is an irrelevant factor; but that doesn't mean that it is a good proxy for harm.  Nor does it necessarily reflect an individual's relative position within the distribution chain.  For example, it may be assumed that a defendant charged with transporting five kilograms of cocaine into the United States in a single shipment is likely to have access to much more, and equally likely to be shipping such large quantities on a regular basis.  A defendant in Desean's position, by contrast, may have distributed the same quantity, but as a result of numerous discrete purchases by a large number of buyers over an extended period of time.  The potential penalties may be identical, but it does not follow that the punishment should be identical as well.

(3)     The crack/powder disparity justifies a below-guidelines sentence.

Desean accepts responsibility for selling crack cocaine and stands ready to suffer the consequences.  Those consequences are harsh.

The federal bench has long voiced dissatisfaction with the crack guidelines, from the Judicial Conference's "view that the disparity between penalties for powder cocaine and crack

---

[9]     To the best of defense counsel's knowledge they are James Bagby, Marcus Lewis, Roy Lee Richard and Darrell Snowden.  According to the PSR, Richard received a sentence of 48 months; Bagby received 96 months; and Snowden and Lewis each received 120 months.  The information regarding their career offender status was obtained by reviewing accessible plea agreements.

SENTENCING MEMORANDUM                    -13-

1   cocaine is not supportable and harms public confidence in the federal judiciary,"[10] to the

2   Supreme Court's declaration in *Kimbrough v. United States*, 128 S.Ct. 558, [675 or 575?]

3   (2007), that "the crack/powder disparity produces disproportionately harsh sanctions, i.e,

4   sentences for crack cocaine offenses 'greater than necessary' in light of the purposes of

5   sentencing set forth in § 3553(a)." *Kimbrough's* declaration has found its voice in the courts of

6   appeal.   In *United States v. Medina Casteneda*, 511 F.3d 1246, 1248 (9th Cir. 2008), for

7   example, the district court rejected the defendant's request that it consider the powder/crack

8   disparity in determining his sentence. *Medina Casteneda,* 511 F.3d at 1248-49.  The Ninth

9   Circuit remanded and directed that the district court reconsider the defendant's sentence "in light

10   of the *Kimbrough* decision and to determine whether the disparity between crack and powder

11   cocaine produced a sentence 'greater than necessary' under § 3553(a). *Id.* at 1249. *Kimbrough*

12   and *Medina Casteneda* each confirm that the crack/powder disparity is a relevant factor to

13   consider under § 3553(a).

14        Apropos of this disparity, the court in *United States v. Barsumyan*, 517 F.3d 1154, 1159

15   (9th Cir. 2008), observed that "[i]f the operation of one particular guideline has inappropriately

16   distorted the final range calculation, that is one factor which the district court may take into

17   account in determining the final sentence."  Here, the crack cocaine guidelines, as compared to

18   the applicable powder cocaine guidelines, distorts the final calculation.  As it stands, Desean is

19   facing a guidelines range of 360 months to life.  Were he to be sentenced under the 1:1 ratio

20   recommended by the Sentencing Commission, and employed by this Court in sentencing other

21   co-defendants here, the base offense level would be 32, based on 5 kilograms of cocaine. *See*

22   USSG § 2D1.1(c)(4).  The plea-adjusted guidelines range, even assuming the 4-level

23

24

25        [10]    Available at:

26               http://sentencing.typepad.com/sentencing_law_and_policy/files/clc_letter_re_crac
k_retroactivity.pdf.

SENTENCING MEMORANDUM         -14-

1  organizer/leader increase and Criminal History Category VI, would be 235 to 293 months[11], more

2  than ten years below the 360 months to life range Desean presently faces.

3       A sentence of no more than thirteen years, based partly on the powder/crack disparity,

4  would ensure that Desean's sentence bears a rational relationship to sentences meted out to

5  similarly situated defendants convicted of distributing the same drug in a slightly different

6  chemical form.

7            (4)    The career offender provision is inconsistent with § 3553(a).

8       The career offender guideline range is both extraordinarily severe and markedly unlikely

9  to promote sentencing purposes prescribed by the guidelines. *See* USSC, *Fifteen Years of*

10 *Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is*

11 *Achieving the Goals of Sentencing Reform,* at 133-34 (2004).  A bit of background is necessary

12 to see why this is so.

13      The genesis of the career offender provision is 28 U.S.C. § 994(h), which suggests that

14 career offenders be sentenced near the statutory maximum.  By its terms, the statute is directed to

15 the Sentencing Commission, not the courts.  The Senate Report explained that it "was added to

16 the bill . . . to replace a provision . . . that would have mandated a sentencing judge to impose a

17 sentence at or near the statutory maximum for repeat violent offenders and repeat drug

18 offenders."  S. Rep. No. 98-225 at 175 (1983).  The Sentencing Commission, however, rather

19 than employing an empirical approach[12] to the career offender provision by examining past

20 sentencing practices, instead keyed the offense levels to statutory maximum sentences. USSG

21 §4B1.1(b)(A) - (G).

22      The government has argued in other cases that a sentence below the career offender

23

24      [11]    Offense level 32 + 4 - 3 = 33.  At Category VI, the range is 235 - 293 months.

25      [12]    The Supreme Court noted that it was "fair to assume" that a guideline range
   "reflect[s] a rough approximation" of sentences consistent with §3553(a)'s objectives because
26 the Commission had taken an empirical approach, i.e. examining past sentencing practices, in
   formulating many of the guidelines.  *Rita*, 127 S.Ct. at 2464-65.

SENTENCING MEMORANDUM          -15-

guideline range based on the reasoning in *Gall* would nullify § 994(h), but the argument has not been well-received.  In *United States v. Martin*, 520 F.3d 87 (1st Cir. 2008), affirming a 91-month downward variance from the career offender guidelines, the court found the argument to be "wide of the mark."  The Supreme Court's decision in *Kimbrough*, 128 S. Ct. at 574-75, opened the door for a sentencing court to deviate from the guidelines in an individual case even though that deviation seemingly contravenes a broad policy pronouncement of the Sentencing Commission."  *Id.* at 96.  As the Second Circuit trenchantly has observed, "Congress did not intend § 994(h) to deprive the courts of authority to impose on a career offender a prison term that is not near the statutory maximum." *United States v. Sanchez*, 517 F.3d 651, 662-65 (2d Cir. 2008); *see also United States v. Boardman*, 528 F.3d 86, 87 (1st Cir. 2008) (remanding to permit district court to consider sentence below the career offender guidelines).

The foregoing makes clear that the career offender guidelines – more often than not, and most certainly in Desean's case – do not consist with, much less advance, the goals of §3553(a). In conjunction with the present crack guidelines, this translates to an increase from a powder-based guidelines range of 210 - 262 months[13] to 360 months to life.  In other words, Desean faces a sentence nearly twelve years higher because of the career offender and crack guidelines provisions.  Application of this classification will "inappropriately distort[] the final range calculation," *Barsumyan*, 517 F.3d at 1159.

Desean is caught in the crossfire from two draconian guidelines provisions: the crack/powder guidelines disparity as exacerbated by the career offender provision.  Each provision, standing alone, suggests an unduly harsh sentence; together, they result in a potential sentence that simply is beyond the pale.  The Court accordingly should impose a sentence that more appropriately reflects the directives of §3553(a).  A sentence of no more than 13 years is

---

[13]     If the Court chose to impose sentence based on Desean's actual criminal history category (in this case V), and plea-adjusted offense level of 33 (*see* footnote 11 *ante*), the resulting range is 210 - 262 months.

1    just such a sentence.

2              (5)    The career offender predicates in this case are relatively minor.

3         The career offender guidelines are triggered if the defendant has suffered two previous

4    felony controlled substance convictions.  USSG §4B1.1(a).  The guidelines' definition of

5    "controlled substance offense," however, does not distinguish between drug types and their

6    related penalties.  Thus, it makes no difference whether the defendant was trafficking in ship

7    container quantities of heroin or dime bags of marijuana; each is a controlled substance offense

8    and each may trigger application of the career offender guidelines.

9         There lies the rub: the prior convictions which render Desean a career offender are

10   relatively minor.  The first, possession of marijuana for sale, dates back to 1998; the second,

11   consolidated convictions for possession of marijuana (roughly 21 grams gross weight) and

12   cocaine base for sale (roughly 28 grams gross weight), occurred in 2001.  The nature of these

13   prior convictions provide an additional reason why application of the career offender guidelines

14   this case would result in an excessively harsh sentence.

15             (6)    Assuming the Court applies a 1:1 ratio in determining the base offense
                      level, the 4-level organizer-leader enhancement unduly skews the
16                    sentencing range.

17        Should the Court here apply a 1:1 crack to powder ratio to Desean's sentencing

18   guidelines, as it has in the case of every other co-defendant in this matter subject to the crack

19   guidelines, the base offense level will be 32.[14]  The corresponding sentencing range, assuming

20   Category V, is 188 - 235 months.  When the 4-level organizer-leader enhancement set forth in

21   §3B1.1(a) is applied, the sentencing range is 292 - 365 months, an increase of almost ten years at

22   the low end of the range.

23        Although Desean accepted this 4-level increase as part of his plea agreement, it does not

24   follow that a sentence reflecting this increase is warranted.  First, as stated *ante*, this case does

25   _____

26        [14]    These calculations assume that the Court chooses to vary from the career offender
     guidelines.

1   not involve the type of organized, hierarchical conspiracy in which Desean pulled the strings of

2   drug-distributing marionettes; it simply involves a number of people who resold crack cocaine

3   that Desean had sold to them.

4         On this issue, *Bannister* again is instructive.  There, co-defendant Tatum was subject to

5   the same 4-level enhancement and the same guideline range that Desean faces here, but Tatum's

6   enhancement was based on his leadership of a tightly-controlled and cohesive drug dealing

7   organization.  The court nonetheless determined that a fifteen-year sentence met the directives of

8   section 3553(a).

9         Moreover, a nearly ten-year increase would constitute about one-third of the low end of

10  the guideline range.  This is an inordinately high percentage of the overall sentence, and a

11  sentence based on this enhancement similarly will "inappropriately distort[] the final range

12  calculation," *Barsumyan*, 517 F.3d at 1159.

13        Because this case does not involve the type of sophisticated organization present in

14  *Bannister*, and the 4-level guidelines enhancement unduly distorts the final range calculation, a

15  sentence of no more than thirteen years is appropriate.

16  **B.      A Sentence of No More Than Thirteen Years Will Create Adequate
            Deterrence**

17

18        The longest prison sentence Desean has served is three years.  A sentence of thirteen

19  years therefore is more than four times as long as any previous punishment.  Further, a thirteen-

    year sentence, when considered in conjunction with a five-year term of supervised release[15] and

20  the more intensive supervision employed by the U.S. Probation Office, creates an environment

21  sufficiently restrictive to deter Desean from re-offending.

22

23  **C.      Desean Has Demonstrable Capability to Rehabilitate Himself**

24        Desean is an especially good candidate for rehabilitation.  His experience with the federal

25  criminal justice system has been, to say the least, enlightening.  First, he realizes that his conduct

26

_____

[15]      As recommended by the probation officer.  PSR, Sentencing Recommendation.

has adversely affected those persons for whom he cares the most.  This includes his wife, Malikha Daniels, with whom Desean shares parental responsibility for their six-year old daughter, Ashanti.  PSR, ¶ 66.

In addition, he has vowed not to re-offend.  His vow is not mere lip service; instead, he already has taken steps in that direction by writing two books, one of which is slated for publication this year, dealing with the perils of the criminal lifestyle and urging those with deprived backgrounds similar to his own not to fall into its trap.[16]

It is equally important that Desean has shown the ability to excel, not simply succeed, given appropriate guidance and structure.  As noted in the background section of this memorandum, Desean lived at EE's Group Home in San Jose for a two-year period beginning when he was 16 years old.  For the first time in his life, he had structure: a stable residence and guidance from suitable role models.  As a result, he flourished.  He obtained steady employment, got along well with his peers and followed the home's rules without incident.  He also remarkably improved his grades: while previous semesters had shown an abysmal .83 grade point average, in the 1995 academic year at Calero Community School, Desean obtained a 3.47 grade point average.  Notably, this average reflected study in core subjects such as mathematics, life science, history and English.  *See* Tamburello Decl., Exh. 2.

The numerous letters of support, copies of which are attached as Exhibit B, are consistent with his vow.  They uniformly attest to the difficult environment in which he was raised, his devotion to his family, and, the belief that he successfully and permanently can abandon the conduct that brings him before the Court.

The foregoing demonstrates that Desean can rehabilitate himself, thoroughly, given the

---

[16]      The books are entitled "Small Town Cemetery" and "Now - Before Tomorrow's Too Late," and will be available through Street Smart Publications.  Desean's publishing company is part of a broader goal to provide outreach services to at-risk youth, especially those in the East Palo Alto area.  The website is located at www.streetsmartpublication.com.

opportunity to do so.  Desean's only desire is to demonstrate to the Court that he is worthy of that

opportunity.  *Tapia* instructs that imprisonment does not accomplish rehabilitation, a

determination with which Congress and the government agree.  For this additional reason, a

sentence of no more than 13 years is appropriate.

**D.     Protection of the Public**

The requested sentence similarly will protect the public.  A sentence of no more than 13

years ensures that Desean will not be released back into the community for a substantial period of

time.  During that time, he will have access to programs and counseling, and be better equipped

to address and deal with the issues that have caused problems in his life.

**E.     A Sentence of No More Than Thirteen Years Will Permit Necessary
         Treatment and Training**

Desean's substance abuse problems are acute.  He began drinking alcohol and

experimenting with marijuana at the age of eight, and progressed to smoking 2 to 3 grams of

marijuana daily.  He also has used cocaine, Ecstasy and substantial amounts of Promethazine.

PSR, ¶¶ 78 - 82.  Although he has enrolled in substance abuse programs in the past, he did so

primarily to appease a close family friend who expressed concern about his drug use.  PSR, ¶ 83.

His participation in RDAP, the Residential Drug Abuse Treatment Program offered by the

Bureau of Prisons, will permit him to overcome a persistent pattern of substance abuse, and

create a physical and psychological environment suitable to his rehabilitation.

//

//

//

//

//

//

//

**5. Conclusion**

  For the reasons stated, Desean Gardner respectfully requests that the Court impose a sentence of no more than thirteen years.


Dated: September 7, 2011

<div style="margin-left:40%;">

Respectfully submitted,

BARRY J. PORTMAN
Federal Public Defender

  /S/

JEROME E. MATTHEWS
Assistant Federal Public Defender

</div>