1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   J. DOUGLAS WILSON (DCBN 412811)
3  Deputy Chief, Criminal Division

4  GARTH HIRE (CABN 187330)
   Assistant United States Attorney
5
     1301 Clay Street, Suite 340-S
6    Oakland, California 94612
     Telephone:  (510) 637-3929
7    Facsimile:  (510) 637-3724
     E-Mail:       Garth.Hire@usdoj.gov
8
   Attorneys for Plaintiff
9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12                    OAKLAND DIVISION

13  UNITED STATES OF AMERICA,          )   No. CR 09-0203 CW
                                       )
14           Plaintiff,                )   UNITED STATES' SENTENCING
                                       )   MEMORANDUM FOR DEFENDANT
15     v.                              )   DESEAN NATHANIEL GARDNER
                                       )
16  DESEAN NATHANIEL GARDNER,          )
                                       )   Hearing Date:     September 14, 2011
17           Defendant,                )   Hearing Time:     2:00 p.m.
                                       )
18  ─────────────────────────────────)

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

I.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  FACTS OF DEFENDANT'S CRIMES AND OFFENSE CONDUCT. . . . . . . . . . . . . . . . . 1

III. SENTENCING GUIDELINES CALCULATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV. STATUTORY SENTENCING FACTORS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.     The Sentencing Guidelines Post-*Booker*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.     Consideration of the 3553(a) Factors Call For a Sentence
            of 360 Months. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            1.     Nature and Circumstances of the Offense and History and Characteristics
                 of Defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                 a.    Nature and Circumstances of the Offense. . . . . . . . . . . . . . . . . . 6

                 b.    History and Characteristics of the Defendant. . . . . . . . . . . . . . . 7

                      (1)    *Criminal History*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                      (2)    *Personal History and Characteristics* . . . . . . . . . . . . . . 13

            2.     Need to Reflect the Seriousness of the Offense. . . . . . . . . . . . . . . . . . . . . 14

            3.     Deterrence of Criminal Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            4.     Need to Protect the Public. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            5.     Need to Provide Defendant with Education. . . . . . . . . . . . . . . . . . . . . . . 15

VI.  FINE AND SUPERVISED RELEASE TERM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

VII. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Gall v. United States*, 128 S. Ct. 586 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Kimbrough v. United States*, 128 S.Ct. 558 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Booker*, 543 U.S. 220 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*United States v. Wilson*, 350 F. Supp. 2d 910 (D. Utah 2005).. . . . . . . . . . . . . . . . . . . . . . . . 15

**FEDERAL STATUTES**

21 U.S.C. §§ 846, 841(b)(1)(A)(iii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 3553(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 6

18 U.S.C. § 3553(a),(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**I.**

**INTRODUCTION**

Defendant Desean Nathaniel Gardner ("defendant" or "Gardner") is a drug kingpin whose crack cocaine empire spanned the cities of East Palo Alto, San Jose, Hayward, Oakland, and Stockton.  In a one year period from 2008 to 2009 defendant was responsible for the distribution of over five kilograms of crack cocaine to his subordinates and their customers.  For the reasons set forth below, the government respectfully requests that this Court, after considering the advisory sentencing guidelines and the factors set forth in 18 U.S.C. § 3553(a), sentence defendant to a low-end guideline sentence of 360 months imprisonment, a twenty-year term of supervised release (with agreed upon suspicionless search and community service conditions), a fine of $250,000, a special assessment of $100, and forfeiture of (1) one Mitsubishi Galant, California License Plate (CLP) 6CGL357, Vehicle Identification Number (VIN) 4A3AB36F56E050672; (2) a mobile telephone, bearing Electronic Serial Number 15907252633, previously subscribed to (510) 586-2286, and all of its contents; and (3) a mobile telephone, bearing IMSI 000007072612826, previously subscribed to (707) 704-8460, and all of its contents.

**II.**

**FACTS OF DEFENDANT'S CRIMES AND OFFENSE CONDUCT**

On March 16, 2011, defendant pleaded guilty pursuant to a plea agreement to a violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(iii).  Defendant was the leader and organizer of a large scale sophisticated drug trafficking organization that was responsible for the distribution of over five kilograms of crack cocaine from about March 2008 to March 2009.  The government was able to successfully dismantle defendant's drug trafficking organization through the use of court-ordered wiretaps on two mobile telephones that defendant used to communicate with other members of his organization to conduct the affairs of the enterprise.

Defendant purchased kilogram quantities of powder cocaine from others and then converted or "cooked" those quantities of cocaine into cocaine base in the form of crack cocaine for sale.  Defendant usually converted this powder cocaine into crack cocaine in the apartment in San Jose that he shared with his then-girlfriend (now wife) and co-conspirator Malikha Daniels

and their young daughter.  The amount of crack cocaine defendant manufactured and distributed was extraordinary.  Defendant generally distributed his crack cocaine in one of two ways.

First, defendant established and ran a crack house at 1419 Camellia Drive in East Palo Alto (the Camellia Location).  This house was the residence of co-defendants Lowell "Well" James and Christine "Tina" James and their young son.  Defendant frequently met customers at the Camellia Location (located across the street from his father's house at 1396 Camellia) to provide customers with narcotics directly, or he would have Lowell or Christine James provide the customer with crack cocaine in exchange for cash and defendant would later collect the drug proceeds from Lowell or Christine James.  In fact, from January 7, 2009, through March 7, 2009, defendant provided Lowell and Christine James, or instructed them to distribute, or possess with intent to distribute, a total of at least 892 grams of crack cocaine.  Defendant would regularly collect the drug proceeds from these co-conspirators and re-supply them with more crack cocaine for distribution.

Second, defendant also sold and provided crack cocaine directly to at least twenty-eight other members of the conspiracy, in ounce, half-ounce, quarter-ounce, and eighth-ounce quantities.  Defendant typically charged $600 for an ounce, $300 for a half-ounce, $150 for a quarter-ounce, and $75 for an eighth-ounce.  Frequently, other members of the conspiracy would contact defendant on his mobile telephones (510) 586-2286 and (707) 704-8460 to arrange to purchase crack cocaine.  During these conversations with his co-conspirators, defendant used intentionally vague and coded language to discuss his narcotics trafficking activities in order to avoid detection by law enforcement.  In particular, he used the following terms with the following meanings:

| Vague/Coded Term | Actual Meaning |
| --- | --- |
| "Whole One" | Ounce (28.35 grams) of Crack Cocaine |
| "Zip" | Ounce (28.35 grams) of Crack Cocaine |
| "O-Z" | Ounce (28.35 grams) of Crack Cocaine |
| "Half" | Half-Ounce (14 grams) of Crack Cocaine |
| "One-Four" | Half-Ounce (14 grams) of Crack Cocaine |

| "Quarter" | Quarter Ounce (7 grams) of Crack Cocaine |
|---|---|
| "Mike Vick" or "Vick" | Quarter Ounce (7 grams) of Crack Cocaine |
| "Little Daddy" or "Little Boy" | Quarter Ounce (7 grams) of Crack Cocaine |
| "Seven" | Quarter Ounce (7 grams) of Crack Cocaine |
| "Three-Five" or "Thirty-Five" | Eighth Ounce (3.5 grams) of Crack Cocaine |

In some instances, defendant would sell crack cocaine to a co-conspirator for less than the usual price with the understanding that the co-conspirator would pay defendant back at the next purchase with money the co-conspirator received from selling the crack cocaine that defendant had previously given to him or her. This practice is called "fronting." In addition to setting the price of the crack cocaine and determining whether to "front" a co-conspirator with crack cocaine, defendant also chose the meeting locations where he distributed crack cocaine to other co-conspirators. Typically, defendant used a Mitsubishi Galant, California License Plate (CLP) 6CGL357, Vehicle Identification Number (VIN) 4A3AB36F56E050672, equipped with a hidden compartment to transport cocaine, crack cocaine, and drug proceeds. This vehicle was registered to co-conspirator Lowell James but defendant was the actual purchaser and exclusive user of the vehicle. Defendant used a vehicle registered in his co-conspirator's name in order to avoid detection and apprehension by law enforcement.

In addition to the amounts described above and below, from January 7, 2009, through March 7, 2009, defendant provided at least twenty-five co-conspirators with at least 3.51 kilograms of crack cocaine for re-sale. During the entire length of the conspiracy defendant distributed more than five kilograms of crack cocaine. In light of defendant's pricing scheme, this amounts to approximately $105,932.20 in gross drug trafficking receipts from March 2008 to March 2009 and approximately $74,364.40 in gross drug trafficking receipts from January 7, 2009, to March 7, 2009, alone. The defendant also sold a total of 627.6 grams of crack cocaine to a government informant in 2008 and early 2009.

Finally, during the course of the conspiracy the defendant acted as an organizer and leader of criminal activity that was extensive and involved five or more participants. Specifically, defendant set the prices of various quantities of crack cocaine sold by himself and other members

of the conspiracy.  Defendant decided where drug transactions would occur and established a location from which crack cocaine would be distributed, namely, 1419 Camellia Avenue, East Palo Alto.  Defendant also gave instructions to other members of the conspiracy (such as Lowell James, Christine James, and Malikha Daniels) as to where to meet others for the purpose of selling crack cocaine, how much crack cocaine to distribute, and how much money to collect as payment.

## III.

## SENTENCING GUIDELINES CALCULATIONS

The parties and the USPO agree that the sentencing guidelines applicable to defendant are as follows:

| | | |
|---|---|---|
| Base Offense Level: | 36 | U.S.S.G. § 2D1.1(c)(2) (at least 2.8 but less than 8.4 kilograms of crack cocaine) |
| | + 4 | U.S.S.G. § 3B1.1(a) (Organizer/Leader) |
| | − 3 | U.S.S.G. § 3E1.1(a) & (b) (acceptance of responsibility) |
| **Total** | **37** | |

Based on an offense level of 37 and a criminal history category of VI, defendant's applicable guideline range is 360 months' imprisonment to life.  (PSR ¶ 96).  As noted in the PSR, although defendant qualifies as a career offender based on his multiple narcotics trafficking convictions, this guideline does not apply because the non-career offender guideline produces a higher offense level.  (PSR ¶ 30).

## IV.

## STATUTORY SENTENCING FACTORS

### A.    The Sentencing Guidelines Post-*Booker*

In *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008), an *en banc* panel of the United States Court of Appeal for the Ninth Circuit identified a framework for district courts to follow in the wake of *United States v. Booker*, 543 U.S. 220 (2005), and its progeny.  The "overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just

punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *Carty*, 520 F.3d at 991 (quoting 18 U.S.C. §§ 3553(a), (a)(2)).

Sentencing proceedings are to begin by correctly determining the applicable sentencing guidelines range.  In *Carty*, the Ninth Circuit acknowledged that "[i]n this sense, the Guidelines are 'the starting point and the initial benchmark'" and are to be kept in mind throughout the process."  *Id.* (quoting *Kimbrough v. United States*, 128 S.Ct. 558, 574 (2007)).  The district court should then consider the § 3553(a) factors to decide if they support the sentence suggested by the parties.  *Id.*  The district court may not presume that the sentencing guidelines range is reasonable, nor should the guidelines be given any more or less weight than any other factor.  *Id.* The guidelines should, however, be "respectfully considered."  *Id.*  The district court must of course make an "individualized determination based on the facts."  *Id.*

If a district court judge decides that a sentence outside the applicable guideline range is appropriate the judge "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  *Carty*, 520 F.3d at 991 (*quoting Gall v. United States*, 128 S.Ct. 586, 597 (2007)).[1]

Thus, this Court, having properly calculated the guideline range (which the parties and the USPO agree is 360 months to life), should then look to the factors set forth by Congress in 18 U.S.C. § 3553(a) to determine a reasonable sentence for defendant.  After consideration of the 3553(a) factors, the reasonable and appropriate sentence is one at the low-end of the advisory guideline range, namely, 360 months' imprisonment.

///

///

///

---

[1]  On appeal, the Ninth Circuit will review a sentence to determine whether it is reasonable, and only a procedurally erroneous or substantively unreasonable sentence will be set aside.  *Carty*, 520 F.3d at 993.  Of course, in paragraph 4 of the plea agreement, defendant waived his right to appeal.

UNITED STATES' SENTENCING MEMORANDUM FOR
DEFENDANT DESEAN NATHANIEL GARDNER      6

B.    **Consideration of the 3553(a) Factors Call For a Sentence of 360 Months**

    1.    **Nature and Circumstances of the Offense and History and Characteristics of Defendant**

        a.    **Nature and Circumstances of the Offense**

The nature and circumstances of the offense demonstrate the need for a 360-month sentence. As set forth above, defendant was the organizer and leader of an extensive and sophisticated drug trafficking organization that distributed crack cocaine throughout the Bay Area and surrounding communities. Given that crack cocaine is typically smoked in doses of 0.1 to 0.2 grams, defendant was responsible in a short two month period for flooding the streets with approximately 17,550 to 35,100 doses of crack cocaine. In the one year period in which defendant has admitted distributing at least five kilograms of crack cocaine he was responsible for unleashing approximately 25,000 to 50,000 doses of crack cocaine onto Bay Area streets.

Not only does the extraordinary volume of crack cocaine that defendant manufactured and distributed merit a 360-month guideline sentence, but so does the manner in which defendant operated his drug trafficking organization. Defendant purchased cocaine powder in kilogram quantities, thus creating the demand on which violent Mexican drug cartels thrive. Defendant took this powder cocaine and "cooked" it into crack cocaine in the very same apartment that he shared with his girlfriend and their then five year-old daughter. Defendant showed even less regard for the welfare of the then four year-old son of Lowell and Christine James, who lived in the crack house that he ran at 1419 Camellia. Defendant's drug trafficking operation was extremely lucrative, yet the government was not able to locate or seize the profits of defendant's crack cocaine enterprise, despite evidence obtained during the course of the investigation that defendant was speaking with a Sacramento-area realtor about purchasing a home for cash. Not surprisingly, defendant has refused to discuss his finances with the USPO. For this reason, the government has also requested the Court impose a $250,000 fine.

The nature and circumstances of this offense demonstrate defendant to be a prolific and sophisticated criminal. This conclusion is established not only by the nature and circumstances of the offense of conviction but also by defendant's history and characteristics, including his long

criminal record involving convictions and arrests for drug trafficking, deception, and violence.

**b.      History and Characteristics of the Defendant**

**(1)      *Criminal History***

Defendant has a long criminal career in which he has amassed fourteen criminal history points, putting him in the highest criminal history category.  (PSR ¶¶ 33-55).  Defendant has been convicted of numerous crimes and has spent virtually his entire life from the age of sixteen either in custody, on parole, or on probation.  *Id.*  Demonstrating his complete inability to function in society and obey the law and the conditions of release, defendant has incessantly violated the conditions of probation and parole.  *Id.*  Defendant has also had numerous arrests.

1994: Armed Robbery

On August 11, 1994, at the age of sixteen, defendant was arrested for participating in an armed robbery at a community center.  (PSR ¶ 34).  Defendant, armed with a 9mm semi-automatic pistol replica, and his accomplice, Clarence Harvey, armed with a .357 revolver, robbed two men of their personal belongings at gunpoint.  Defendant received an out of home placement.

1997: Second Degree Burglary

On January 9, 1997, at the age of eighteen, defendant was arrested and later convicted of second degree burglary.  (PSR ¶ 35).  On May 8, 1997, defendant was sentenced to two years probation and two days jail.  Only five months later, on May 30, 1997, defendant's probation was revoked, reinstated, modified, and extended two years.  In addition, defendant used a false name and his brother's name during the underlying crime.  This behavior is a continuing pattern in defendant's criminality.  Defendant constantly tries to evade capture or avoid responsibility by claiming to be someone else or using a false identity and he repeatedly violates the conditions of his release.

1997: Offer to Sell Crack Cocaine

On June 18, 1997, according to a San Mateo County Sheriff's Report, officers and agents conducted an operation to purchase narcotics from street-level dealers in the East Palo Alto area.  (PSR ¶ 47).  An undercover agent fitted with a covert audio transmitter and in possession of $20

attempted to purchase narcotics.  The agent was overhead speaking with a subject and then gave the arrest signal.  Agents converged on the location and detained several individuals including defendant, who was one of the individuals who offered to sell the undercover agent crack cocaine.  Defendant had $129 on his person.  No charges were filed.

1998: Possession of Marijuana for Sale

On January 19, 1998, at the age of nineteen, defendant was arrested for possession of marijuana for sale.  (PSR ¶ 36).  On May 19, 1998, defendant was convicted and sentenced to three years probation and there months jail.  However, numerous probation revocations, a prison sentence, and several parole violations ensued, as set forth below:

| DATE | EVENT |
| --- | --- |
| September 29, 1998 | Probation revoked and reinstated; six months jail |
| May 21, 1999 | Probation revoked and reinstated; serve additional 60 days jail |
| December 1, 1999 | Probation revoked and reinstated; serve additional 120 days jail |
| December 11, 2001 | Probation revoked and terminated; 16 months prison |
| December 13, 2002 | Paroled |
| August 7, 2003 | Parole violated for absconding to Kenner, Louisiana and attempting to purchase a firearm |
| January 28, 2004 | Paroled |
| August 26, 2005 | Parole violation, returned to prison to finish term |
| June 30, 2006 | Paroled |
| December 1, 2006 | Parole violation, returned to prison to finish term |
| December 13, 2006 | Paroled |
| April 13, 2007 | Discharged from parole |

1998: False Identification to a Peace Officer

On April 9, 1998, at the age of twenty, defendant and Clarence Harvey (the same individual with whom he committed the armed robbery four years earlier) were pulled over in a vehicle driven by Harvey following a dispute at Zenith Wire Rims.  (PSR ¶ 37).  During the traffic stop, defendant claimed to be his brother Dontae.  The vehicle was searched because Harvey was on probation.  In the open center console the officer found eight separate packages of

cocaine base inside a napkin, a pager, and a mobile telephone. During a search of defendant officers located $2,300 (which was clearly drug trafficking proceeds). Defendant was convicted and sentenced on March 24, 2000, to two years probation and 30 days jail. Defendant was dismissed early from probation on December 14, 2001.

1999: False Identification to a Peace Officer

On June 3, 1999, at the age of twenty-one, defendant was arrested for presenting a false identification to a peace officer. (PSR ¶ 38). On June 28, 1999, defendant was sentenced to eighteen months probation and sixty days jail. On December 1, 1999, defendant's probation was revoked and terminated.

1999: Driving on a Suspended License

On September 24, 1999, still at the age of twenty-one, defendant was arrested for driving on a suspended license. (PSR ¶ 39). On December 1, 1999, defendant was sentenced to two years probation and 39 days jail. On December 11, 2011, defendant's probation was revoked and terminated.

2000: Grand Theft of Personal Property Valued Over $400

According to a Campbell Police Department (CPD) Report, on February 11, 2000, a CPD officer responded to Zenith Wire Wheels to meet with a D.A. Investigator regarding a prior forgery. (PSR ¶ 40). The owner of the store reported that on August 10,1998, defendant came in and placed an order and put down a $200 deposit, resulting in an unpaid balance of $2,700. On February 4, 1999, defendant returned to the store and upgraded his purchase by $200, increasing the balance owed to $2,900. Defendant, however, told the owner that he had previously made a payment of $2,180 on October 11, 1998, and that defendant therefore owed only $720. This was a lie. When asked if he had a receipt for this payment, defendant produced a photocopy of the invoice which appeared to show the owner's writing and signature showing the $2,180 payment was received. Although the owner did not recall receiving the payment he accepted the receipt as proof of payment and defendant paid $720 and received his order. It was later discovered that the receipt was forged. Defendant was sentenced on December 14, 2001, to one year in jail.

2001: Possession of Cocaine Base and Marijuana for Sale and False Personation

On March 16, 2001, at the age of twenty-three, defendant was driving a Lincoln Navigator at 12:37 a.m. when he was pulled over by a CPD officer. (PSR ¶ 41). As the officer approached the vehicle he smelled the strong odor of marijuana. Defendant provided the officer with a California driver's license and identification card bearing the name William Lavelle Hicks and defendant's photograph. After providing this false identification to the officer defendant then lied about whether or not there was marijuana in the vehicle. Defendant exited the vehicle but became agitated and nervous and started to pull away from the officer. As the officer attempted to pat search defendant the passenger in the vehicle fled. After defendant was detained and handcuffed, the officer located a plastic bag containing twenty-nine dime-sized baggies of marijuana packaged for sale inside defendant's pants packet. In another pocket, defendant possessed four separate bags of cocaine base. The passenger was eventually apprehended and searched. He also had cocaine base, cash, and marijuana. More cocaine base and a mobile telephone were also located in the vehicle. Defendant had $168 on his person while his passenger had $7,557 on his person. After he was fingerprinted, the police learned defendant's true identity and the fact that there were several warrants out for his arrest.

2003: Attempted Purchase of a Firearm As a Felon

According to a California Department of Corrections and Rehabilitation (CDCR) Charge Sheet, defendant absconded while on parole to Louisiana. While there, defendant applied to purchase a firearm in Kenner, Louisiana. When officers of the Kenner Police Department contacted defendant, he identified himself as William Hicks and had even obtained a Louisiana driver's license under that alias. Defendant's parole was violated and he was returned to custody.

2004: Driving While License Suspended

On May 3, 2004, at the age of twenty-six, defendant was arrested for driving on a suspended license. (PSR ¶ 43). Defendant again used the false identity of William Hicks. Defendant was sentenced to two days jail.

<u>2005: False Identification to a Peace Officer, Possession of Pepper Spray and Marijuana</u>

According to a CDCR Charge Sheet, on July 13, 2005, an East Palo Alto Police Department Officer was on patrol when he observed an individual in a vehicle that he knew was a suspect in an attempted murder.  The officer tried to arrest the suspect and a struggle ensued during which a firearm fell from the suspect's person.  Defendant was seated in the driver's seat of the vehicle and provided another officer with a California Driver's license number with the name of William Hicks.

Two days later, San Mateo Police and a CDCR agent conducted a search of defendant's residence and found pepper spray and a large bag of marijuana.  On August 26, 2005, defendant's parole was violated and he was returned to custody.

<u>2006: Possession of a Narcotic Controlled Substance</u>

On April 24, 2006, according to a Santa Clara Police Department report, officers were dispatched following a report of a suspicious person attempting to break into a vehicle.  (PSR ¶ 49).  While officers were checking the area, the reporting party called 911 to report an associated vehicle was possibly leaving the scene.  The vehicle was located and stopped.  Defendant was the driver.  The officer noticed the strong odor of marijuana as he approached and defendant gave the officer an Oakland cannabis club card in the name of William Hicks.  Defendant gave consent to search the vehicle.  Inside the vehicle officers recovered a small plastic bag with crack cocaine and a small electronic scale with marijuana residue and a small box of sandwich bags.  Defendant was arrested for possession of narcotic controlled substance, auto theft, and a parole violation. No new charges were filed.

<u>2006: Assault and Battery, Kidnapping</u>

According to a CDCR Charge Sheet, on October 26, 2006, a woman contacted a CDCR agent and reported that defendant lured her to an apartment of her friend.  Defendant then beat her with a closed fist about her mouth, cutting the inside of her mouth with his punches, hitting her eyes, and also kicking her in her ears.  Defendant then hit the victim on her left hand with a hammer.  The victim then stated that defendant threatened her with a razor blade and a nickel plated handgun, which defendant had behind his back when the victim arrived at the apartment.

The victim further claimed that defendant repeatedly demanded "tell me where my shit (drugs) is," and "what did you do with my dope, bitch." The victim repeatedly told defendant she did not know where his drugs were. After being held hostage for two hours she said that she managed to escape. The East Palo Alto Police Department was called and responded but she did not make a statement because she feared for her life. The victim later made a statement to CDCR and her injuries were photographed. Defendant denied knowing anything about the incident. The document later states:

> [Defendant's] adjustment to parole has been poor. He has maintained a stable residence, but he's never proved employment. From the evidence in these charges, [defendant] continues to deal in drugs, and is now assaulting and battering people for the drugs, to the point of now brandishing firearms and deadly weapons (in this case a razor blade and hammer. It is highly recommended to the Board of Prison Hearings, the [defendant] is returned to custody.

On December 1, 2006, defendant's parole was violated and he was returned to custody.

<u>2007: Driving Without a License</u>

On August 19, 2007, at the age of twenty-nine, defendant was arrested for driving without a license when he was stopped at 3:44 a.m. in a vehicle without a license plate. (PSR ¶ 44). Defendant was sentenced to one year probation. Defendant was serving this term of probation while simultaneously manufacturing and distributing crack cocaine throughout the Bay Area.

<u>2007: Assault and Battery</u>

On August 26, 2007, according to a San Jose Police Department report, an officer was on patrol in front of Scores Bar & Grill when he noticed a security guard pointing at defendant. (PSR ¶ 51). The officer observed two other officers take defendant into custody. The victim was bleeding from his chin and told the officer that he was working security at Scores and was breaking up a fight when defendant struck him in the face with his closed right fist. The victim sustained a half inch laceration that went all the way through his chin and required stitches to close the wound. Defendant was searched and was in possession of a plastic bag containing

marijuana.  Defendant was cited for assault and battery and possession of less than one ounce of marijuana and released at the scene.  Defendant was arrested on the instant federal charges while that case was pending and the matter remains unresolved.

The crimes and incidents described above demonstrate defendant's continued dedication to deception, drug trafficking, and violence, even while on parole or probation and in complete disregard of the conditions of his release.  Defendant's extensive criminal history, repeated violations of parole and probation, and willingness to lie to law enforcement, especially when viewed in conjunction with defendant's role as the leader and mastermind of a sophisticated regional drug trafficking organization, all support the low-end 360-month guideline sentence recommended by the government.

### (2)      *Personal History and Characteristics*

The details of defendant's personal life also support the requested sentence of 360 months imprisonment.  Defendant's personal life is rife with relatives and loved ones addicted to drugs, including his father, his mother, and all thirteen of his grandmother's children.  (PSR ¶¶ 59-60).  Yet despite growing up surrounded by the horrors of drug addiction and its devastating effects on families and children, defendant chose to profit handsomely by unleashing that same pain onto countless other families and children.  As early as second or third grade defendant wanted to "hustle and sell drugs like his father" who was a "big drug dealer" and drove fancy cars.  (PSR ¶ 61).  Although he supposedly received a beating from his father when he heard this, defendant nonetheless realized his dream and became an even bigger drug dealer than his father ever was at a much younger age.

Defendant's personal life is no less admirable than his illicit professional life.  Despite being in a relationship with Malikha Daniels for the past twelve years, defendant only married her in September 2009, roughly six months following his indictment and in an obvious and transparent attempt to prevent her from testifying against him.  (PSR ¶ 66).  During the course of the wiretap investigation it was obvious to both law enforcement and Ms. Daniels that defendant was not faithful to her.  In addition – despite making money hand over fist by selling crack cocaine all over the Bay Area and driving a flashy bright yellow customized Dodge Charger and

wearing expensive jewelry and looking to pay cash for a home – defendant does not pay any child support for his fourteen year-old son Desean Gardner Jr. and owes back child support. (PSR ¶ 67).  Defendant even took advantage of the government and the taxpayers by claiming Section 8 subsidized housing benefits so he could pay only $200 for rent instead of $1,300 to $1,400 per month when he was making far more than that per month selling crack cocaine.  (PSR ¶ 68).

Defendant's tattoos also reflect his commitment to criminality.  Defendant has a tattoo that says "Lawless" on his right forearm, "Neva Legal" across his back, and "Fuc the World" with a middle finger pointing to the world and "G-Boy" on his upper right arm.  (PSR ¶ 75).

Defendant has no verifiable record of employment because defendant has dedicated his entire adult life to becoming an expert in the business of narcotics trafficking.  Importantly, paragraph 92 of the PSR states, "[o]n the advice of counsel, the defendant declined to discuss his finances.  Therefore, it is unknown where the defendant has any assets.  However, a review of his credit report shows no liabilities." (emphasis added).  Paragraph 93 of the PSR correctly advises that, "[b]ecause the defendant did not discuss his financial condition, it is assumed that he has the ability to pay a fine within the guideline range."  Not only does the government concur with this assumption, but defendant's refusal to cooperate with an assessment of his financial circumstances is consistent with his lifelong efforts to deceive law enforcement and the courts and to maximize his profits from his illegal narcotics trafficking.

Throughout his life, defendant has demonstrated time and time again that he cannot or will not change his ways.  This is why a 360-month sentence is necessary, reasonable, and appropriate.  Without question, the nature and circumstances of the offense and defendant's history and characteristics show him to be a life-long, deceptive, violent, drug dealing criminal incapable of conforming his conduct to the law who must be incapacitated until he reaches an age where he will no longer pose a threat to society.

## 2.    Need to Reflect the Seriousness of the Offense

The offense in question –  masterminding a sophisticated and wide-ranging drug trafficking organization in which he manufactured kilograms of crack cocaine and oversaw their

distribution throughout the region, including from a crack house in East Palo Alto in which a small child lived – is extremely serious.  A sentence of 360 months' imprisonment is necessary to reflect the seriousness of defendant's leadership of such a large drug trafficking conspiracy.

### 3.      Deterrence of Criminal Conduct

By imposing a 360-month sentence on defendant the Court has the opportunity to have a strong specific and general deterrent effect.  First, defendant will be specifically deterred from committing more crimes by knowing that another very lengthy prison term awaits him should he re-offend.  Perhaps more importantly, this Court has an opportunity to send a strong signal to others who might be tempted to embark on the same path of drug dealing in order to live what might appear from the outside to be the glamourous life a big time drug dealer, that a lengthy term of federal imprisonment is the result.  Through the 360-month sentence requested by the government, this Court can generally deter others from engaging in the same conduct as the defendant and thereby make East Palo Alto and the greater Bay Area and surrounding communities a safer place.

### 4.      Need to Protect the Public

The public needs to be protected from recidivists, like defendant, who continue to commit narcotics trafficking and other crimes while on probation and parole.  If the Court imposes the requested 360-month sentence, and assuming defendant serves only 85% of that sentence, defendant would be fifty-eight years old upon release.  At this age defendant will be far less likely to engage in criminal behavior.  Accordingly, a 360-month sentence of imprisonment will without question protect the public.

### 5.      Need to Provide Defendant with Education

The need to provide defendant with education and vocational skills, while important in most contexts, must be placed in a subordinate position to the important considerations of deterrence, protection of the public and the need for the sentence to reflect the seriousness of the offense.  *See United States v. Wilson*, 350 F. Supp. 2d 910, 921-22 (D. Utah 2005) (noting that legislative history of Sentencing Reform Act demonstrates that Congress intended to place rehabilitation as a secondary consideration where serious crimes were involved).  Defendant will

have access to many programs in the prison system to which he can avail himself. Neither the presence nor absence of any further educational programs should weigh heavily in this Court's sentencing determination.

## V.

## FINE AND SUPERVISED RELEASE TERM

The government respectfully requests that the Court order defendant to pay a fine within the guideline range for defendant's offense. Based on a total offense level of 37, the fine range is $20,000 to $4,000,000. (PSR ¶ 102). The government believes that a fine of $250,000 is appropriate in this case.

As for the requested twenty-year term of supervised release, the government believes that defendant's criminal history and sophistication merit such an extensive term of supervision. Defendant has not only led a life of crime but he has become increasingly more organized and sophisticated in doing so. A twenty-year period of supervision will be necessary to rehabilitate defendant and deter him from resuming his life of crime upon release.

## VI.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence defendant to 360 months' imprisonment, a twenty-year term of supervised release (with terms and conditions recommended by the USPO and as agreed to by the defendant), and order defendant to pay a $250,000 fine, as well as a $100 special assessment, and order the forfeiture of (1) one Mitsubishi Galant, California License Plate (CLP) 6CGL357, Vehicle Identification Number (VIN) 4A3AB36F56E050672; (2) a mobile telephone, bearing Electronic Serial Number 15907252633, previously subscribed to (510) 586-2286, and all of its contents; and (3) a

///

///

///

UNITED STATES' SENTENCING MEMORANDUM FOR
DEFENDANT DESEAN NATHANIEL GARDNER      17

1   mobile telephone, bearing IMSI 000007072612826, previously subscribed to (707) 704-8460,

2   and all of its contents.

3   DATED: September 7, 2011                    Respectfully submitted,

4                                               MELINDA HAAG
                                                United States Attorney
5
                                                _____/s/_____
6                                               GARTH HIRE
                                                Assistant United States Attorney
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28